2023 IL App (1st) 221247-U

FIFTH DIVISION
January 30, 2023

No. 1-22-1247

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* A.S., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 18 JA 495 |
| | ) | |
| v. | ) | Honorable |
| | ) | Jennifer J. Payne, |
| Michael S., | ) | Judge, presiding. |
| | ) | |
| Respondent-Appellant.) | ) | |

JUSTICE MITCHELL delivered the judgment of the court.
Presiding Justice Delort and Justice Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the circuit court's dispositional orders where the court's finding of parental unfitness is not against the manifest weight of the evidence and where termination of the respondent's parental rights is in the best interest of the minor.

¶ 2    Respondent Michael S. is the biological father of A.S., a minor born in January 2018. Michael appeals the circuit court's orders terminating his parental rights and granting the State the power to consent to the adoption of A.S. The principal issue on appeal is whether the circuit court's determinations that Michael is unfit to have custody of A.S. and that terminating his parental rights

is in A.S.'s best interest are against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 3                                   **BACKGROUND**

¶ 4     By his own account, Michael's life has been marked by violence since his early childhood. When Michael was nine years old, his father was shot and killed. Michael was expelled from high school in 10th grade and required an individualized educational program because he frequently fought other students. As a young adult, Michael was often arrested and charged with violent crimes including battery and aggravated assault. He spent four years in prison after he robbed a drug dealer with a firearm. While Michael was serving his sentence, a psychiatrist diagnosed him as "emotionally disturbed."

¶ 5     Michael and A.S.'s mother, Tia S., began a four-year relationship following his release from prison. According to Tia, Michael was often violent and physically assaulted her, causing a fracture to her orbital bone and facial wounds that required stitches. Michael's violent behavior persisted throughout Tia's pregnancy and in the months after A.S.'s birth. Tia reported that Michael strangled her and dragged her by her hair when she did not respond quickly to A.S.'s cries. In another confrontation, Tia called the Chicago police and filed an incident report because Michael punched her and threw her car keys across a parking lot.

¶ 6     The Department of Children and Family Services sought temporary protective custody of A.S. in May 2018, when she was four months old, upon discovering numerous welts and abrasions on her older half sister's face, arms, and legs. DCFS caseworkers learned that Tia had beaten A.S.'s sister with a purse strap and belt and found that the children lived in a home rife with open alcohol and marijuana. At the time of DCFS's intervention, Michael lived apart from A.S., and his

whereabouts were unknown. Finding that A.S. was neglected and that Michael S. was unable to care for her, the circuit court subsequently adjudged A.S. a ward of the court.

¶ 7    After appearing in the wardship proceedings and establishing his paternity, Michael participated in an integrated assessment to inform his service needs. A.S.'s eventual return to Michael's custody depended on his successful engagement in the recommended services. In light of Michael's extensive violent history, DCFS caseworkers had grave concerns about the safety of returning A.S. to his custody. Nonetheless, they developed a service plan in accordance with the circuit court's goal of A.S.'s return home within 12 months. Michael initially appeared motivated to participate in the recommended services, completing the "nurturing parenting program" and complying with all drug screenings. He also attended 20 sessions at the Center for Domestic Peace, where he learned skills for avoiding physical violence. Michael's progress stalled over time, however. After two years, he had yet to participate in individual therapy or parent-child psychotherapy, which were two components of his service plan. He also saw A.S. less frequently after the circuit court temporarily suspended unsupervised visits, although supervised visits were still allowed.

¶ 8    In all, Michael attended seven sessions of parent-child psychotherapy, two of which he ended early. He canceled three other appointments and failed to appear for another. The therapist noted that Michael "had difficulty engaging in sessions consistently and constructively, often *** engaging in confrontational and argumentative conversations." Michael's "lack of consistent, meaningful engagement, reflective conversation, and ability to stay emotionally regulated during sessions" ultimately led the therapist to terminate services. The therapist recommended that Michael seek individual treatment instead. Michael did attend six individual therapy sessions with

Dr. Lawrence Cox during an overlapping six-month period. He again struggled with consistent participation, failing to keep 14 of his scheduled appointments. When the circuit court expanded Michael's visitation rights on the condition that he continue to attend therapy, Michael stopped attending altogether. Dr. Cox waited several months for Michael to reengage. That never occurred, and Dr. Cox discharged Michael for "noncompliance."

¶ 9     Because of Michael's lack of progress, the circuit court changed A.S.'s permanency goal to termination of parental rights, observing that her return home remained a distant possibility. The State subsequently petitioned to terminate Michael's parental rights.[1] The State alleged that Michael, over three consecutive nine-month periods, (1) failed to make reasonable efforts toward correcting the conditions that led to A.S.'s removal, (2) failed to make reasonable progress in correcting those conditions, and (3) failed to maintain a reasonable degree of interest, concern, or responsibility as to A.S.'s welfare. Following a hearing, the circuit court found, by clear and convincing evidence, that Michael is unfit to parent A.S. under all three of the alleged statutory grounds (see 750 ILCS 50/1(D)(b), (m)(i)-(ii) (West 2020)). The court then found that it is in A.S.'s best interest to terminate Michael's parental rights. 705 ILCS 405/2-29(2) (West 2020). This timely accelerated appeal followed. Ill. S. Ct. R. 301 (eff. July 1, 2017); R. 311(a)(4) (eff. July 1, 2018).

¶ 10                                             **ANALYSIS**

¶ 11    Michael challenges the circuit court's finding of parental unfitness based on his lack of reasonable efforts and progress toward reunification and interest in A.S.'s welfare. We review whether the circuit court's parental unfitness determination is against the manifest weight of the

---

[1] Tia later died in a July 2020 car accident.

evidence, and we will not reverse the circuit court's findings unless the opposite conclusion is clearly apparent from the record. *In re D.D.*, 2022 IL App (1st) 220410, ¶ 65.

¶ 12 A parent is unfit where he fails to make reasonable progress toward the return of the child during any nine-month period following the circuit court's adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2020). "Reasonable progress" is an objective standard measured by the parent's compliance with the court's directives, service plans, or both and requires that the parent make measurable or demonstrable strides toward reunification. *In re D.F.*, 332 Ill. App. 3d 112, 125 (2002). As to Michael, his caseworkers recommended individual therapy and child-parent psychotherapy following their initial assessment, which noted that "for reunification to be considered, [Michael] would need to participate in his own intensive therapeutic process and services to explore his own pervasive relationship patterns which are impacting his ability to meet [A.S.'s] needs." Therapy was a critical part of his service plan given his history of physical violence and aggressive behavior toward others. Yet Michael did not begin therapy until two years after receiving his service plan, and then he attended just six individual sessions over six months. In Dr. Cox's opinion, Michael should have seen him once per week (for a total of 26 sessions) during that time.

¶ 13 Michael faults DCFS for failing to provide Dr. Cox with treatment goals against which his progress could be measured. According to Dr. Cox's discharge notes, however, it was Michael's "lack of commitment to therapy" that "[did] not permit proper diagnosis not goal setting." Nonetheless, Dr. Cox evaluated Michael's case file and, with Michael's input, identified two goals—namely, to become a good father by developing greater self-awareness and to gain control of his emotions and temper. As a result of Michael's decision to discontinue his therapy sessions,

Dr. Cox was unable to state what, if any, progress Michael had made toward achieving those goals. Dr. Cox's impression that Michael "talked a good enough game" during sessions, but his overall "lack of interest, concern, and attendance" had hindered any headway in his treatment.

¶ 14    As to child-parent psychotherapy, Michael's service providers set forth his treatment goals as follows: "understand his role in minor's experiences, strengthen his relationship with minor, and identify ways to support minor in creating safe boundaries and healthy communication." The therapist and Michael "discussed appropriate boundaries, expectations, [and] respectful ways to speak with one another, and [they] established guidelines towards appropriate behavior moving forward." But Michael "continued to disregard the agreed upon guidelines and expectations making it challenging to engage in conversations *** and make any clinical progress." Based on Michael's continuous displays of obstructive and angry behavior, the therapist concluded that Michael's lack of individual clinical progress rendered him unable to productively participate in sessions. All of Michael's treatment records were before the circuit court during his unfitness hearing. More than three years had passed from the circuit court's adjudication of neglect before the circuit court terminated his parental rights, meaning Michael had a substantial amount of time to demonstrate progress toward reunification with A.S. The circuit court found he had not, and its finding is reasonable based on the record before us.[2]

¶ 15    Michael's remaining objection is of no moment. Michael argues that the circuit court erred by permitting Dr. Cox to testify about Michael's potential progress had he attended therapy more

---

[2] Although the State needed to prove only one of the statutory grounds raised in its petition for us to affirm the circuit court's finding of parental unfitness (*In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16), we note that there was also evidence to support the other two grounds. See, *e.g.*, *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24 (unreasonable degree of interest, concern, or responsibility includes noncompliance with existing service plan (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004))).

consistently. Michael argues that Dr. Cox's opinion lacked any foundation and thus amounted to speculation and conjecture. Not so. "[A]n expert opinion couched in terms of probabilities or possibilities based upon certain assumed facts is not improper or inadmissible." *Rodrian v. Seiber*, 194 Ill. App. 3d 504, 507 (1990); see also, *e.g.*, *Damron v. Micor Distributing, Ltd.*, 276 Ill. App. 3d 901, 911 (1995). Assuming that Michael attended weekly therapy sessions for six months, Dr. Cox opined that there was a "probability" that he would have made greater clinical progress. As a licensed clinician with a doctorate degree in sociology and a master's degree in counseling, Dr. Cox was qualified to give that opinion. The circuit court did not err by admitting that testimony over Michael's objection, and we will not otherwise reweigh Dr. Cox's testimony on review. See *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000).

¶ 16    Even if Dr. Cox's statement were speculative, Michael was not prejudiced in light of the other evidence establishing his parental unfitness. See *In re Chance H.*, 2019 IL App (1st) 180053, ¶ 53 (error is harmless where ample evidence supports the circuit court's findings); see also *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 400 (2007) ("We will not reverse an erroneous ruling unless the error was prejudicial or the result of the trial has been materially affected."). Whether Michael *might have* progressed does not bear on the conclusion that he, in fact, *had not* reasonably progressed. We thus find that the circuit court's finding that Michael is an unfit parent is not against the manifest weight of the evidence.

¶ 17    Michael also challenges the circuit court's decision to terminate Michael's parental rights, arguing that the State failed to prove beyond a preponderance of the evidence that termination is in A.S.'s best interest. We will not disturb the circuit court's determination unless it is contrary to the manifest weight of the evidence. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 35.

¶ 18   Once the circuit court has deemed a parent unfit, the court must weigh the particular facts and circumstances against the factors set forth in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2020)). The evidence at trial reflected that A.S. and her older sister had lived for three years with Sally B., who has signed a permanency commitment and wishes to adopt them. A.S. refers to Sally B. as her mother, and she attends church, vacations, and dinners with Sally B.'s extended family. According to A.S.'s current caseworker, Taylon Phelps, A.S. and Sally B. share a strong and affectionate bond, and all of A.S.'s health, safety, and developmental needs are being satisfied under Sally B.'s care. As the circuit court did, we recognize Michael's love for A.S. and his wish to raise her, but "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). On these facts, we cannot conclude that the circuit court's determination that terminating the parent-child relationship is in A.S.'s best interest is against the manifest weight of the evidence.

¶ 19                                    **CONCLUSION**

¶ 20   For the reasons stated, we affirm the circuit court's judgment.

¶ 21   Affirmed.